# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GAYLYN MILLER,**

   **Plaintiff,**

  **vs.**           **Civ. No. 18-753  JFR**

**ANDREW SAUL, Commissioner**
**of SOCIAL SECURITY,**[1]

   **Defendant.**


## MEMORANDUM OPINION AND ORDER[2]

  **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed October 10, 2018, in support of Plaintiff Gaylyn Miller's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits.  On December 14, 2018, Plaintiff filed her Motion to Reverse or Remand.  Doc. 19.  The Commissioner filed a Response in opposition on February 19, 2019 (Doc. 21), and Plaintiff filed a Reply on February 26, 2019 (Doc. 22).  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Andrew Saul is substituted for Nancy Berryhill as the Commissioner of the Social Security Administration.

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 25.)

# I. **Background and Procedural History**

Claimant Gaylyn V. Miller ("Ms. Miller") alleges that she became disabled on September 2, 2012, at the age of fifty-eight, because of epilepsy, arthritis, cervical pain, complications from stroke, depression, anxiety and migraines. Tr. 396, 406.[3] Ms. Miller completed part of the eleventh grade in 1971, and thereafter worked as a housekeeper and commercial janitor. Tr. 230, 232-34, 398-99, 407.

On October 15, 2014, Ms. Miller filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. Tr. 376-79. Ms. Miller's application was initially denied on June 29, 2015. Tr. 256-69, 270, 285-89. It was denied again at reconsideration on February 16, 2016. Tr. 271-83, 284, 295-99. On April 14, 2016, Ms. Miller requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 301-02. ALJ Michael Leppala conducted a video hearing on July 20, 2017. Tr. 225-55. Ms. Miller appeared in person at the hearing with attorney representative Jamie M. Dawson.[4] *Id.* The ALJ took testimony from Ms. Miller, and an impartial vocational expert ("VE"), Karen Provine. *Id.* On February 14, 2018, ALJ Leppala issued an unfavorable decision. Tr. 203-17. On June 5, 2018, the Appeals Council issued its decision denying Ms. Miller's request for review and upholding the ALJ's final decision. Tr. 1-7. On August 7, 2018, Ms. Miller timely filed a Complaint seeking judicial review of the Commissioner's final decision. Doc. 1.

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 15) that was lodged with the Court on October 10, 2018.

[4] Ms. Miller is represented in these proceedings by Jeffrey B. Diamond. Doc. 20.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations."

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.* "Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(b), 416.972(b).

20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5. The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.     Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d

1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

### III. <u>Analysis</u>

The ALJ made his decision that Ms. Miller was not disabled at step four of the sequential evaluation. Tr. 216-17. Specifically, the ALJ found that Ms. Miller met the insured status

requirements through September 30, 2017, and had not engaged in substantial gainful activity since her alleged onset date of September 2, 2012. Tr. 208. The ALJ determined that Ms. Miller had severe impairments of cerebrovascular accident and affective disorder. Tr. 209. The ALJ also found that Ms. Miller had non-severe impairments of discogenic and degenerative back disorder, obesity, epilepsy, migraines, bunion, hammertoe and arthritis of the feet, hypertension, status-post stent placement, and arthritis. Tr. 209-10. The ALJ determined that Ms. Miller did not have an impairment or combination of impairments that met or medically equaled the severity of a listing. Tr. 210-11. Proceeding to step four, the ALJ found that Ms. Miller had the residual functional capacity to

> understand, carry out, and remember simple instructions and make commensurate work-related decisions. The Claimant could respond appropriately to supervision, coworkers, and work situations. She could deal with routine changes in the work setting. The Claimant could maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout an eight-hour workday. She was limited to completing simple, routine, and repetitive tasks.

Tr. 211. Based on the RFC and the testimony of the VE, the ALJ concluded that Ms. Miller was capable of performing her past relevant work as a cleaner, commercial or institutional.[6] Tr. 216. The ALJ, therefore, determined that Ms. Miller was not disabled. Tr. 217.

In her Motion, Ms. Miller argues that (1) the ALJ improperly evaluated the medical source opinions of examining State agency psychological consultants Carl B. Adams, Ph.D., and James W. Schutte, Ph.D., and treating physician Julio Munoz, M.D., in assessing her ability to do work-related physical and mental activities; and (2) the ALJ improperly accorded Dr. Schutte's opinion differing degrees of weight. Doc. 20 at 18-24.

---

[6] Claimant's past work as a cleaner, commercial or institutional, DOT 381.687-014, is classified as heavy, unskilled work. Tr. 217. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. § 404.1567(d).

For the reasons discussed below, the Court finds the ALJ failed to properly evaluate certain of the medical source opinion evidence. This case, therefore, requires remand.

A.   **The ALJ Failed to Properly Evaluate Certain of the Medical Source Opinion Evidence**

Ms. Miller argues generally that the ALJ failed to properly evaluate three medical source opinions; *i.e.,* examining State agency psychological consultants Carl B. Adams, Ph.D., and James W. Schutte, Ph.D., and treating source Julio Munoz, M.D., in assessing her ability to do work-related physical and mental activities. Doc. 20 at 18-22. More specifically, Ms. Miller argues that each of their opinions assessed that she was severely limited in her ability to concentrate and persist at tasks, yet the ALJ failed to account for this limitation in the RFC. *Id.* Ms. Miller asserts that Dr. Adams' assessed GAF score of 50, which indicates serious impairment in, *inter alia*, occupational and school functioning, supports a greater limitation in concentration and persistence than the ALJ assessed, and that Dr. Adams' assessment is consistent with Dr. Schutte's assessed low IQ and low memory skills, and with Dr. Munoz's assessed limitations regarding Ms. Miller's ability to concentrate and persist at tasks. *Id.* Ms. Miller also argues that Dr. Schutte's opinion regarding her marked limitation to interact with the general public and coworkers is consistent with her testimony and other record evidence, and that the ALJ improperly accorded little weight to this part of Dr. Schutte's opinion. *Id.* Lastly, Ms. Miller asserts that the evidence supports Dr. Munoz's assessed functional limitations in her ability to do work-related physical and mental activities, and that the ALJ's RFC failed to account for any physical limitations at all. *Id.*

The Commissioner contends the ALJ reasonably accounted for Ms. Miller's limitations in concentration and persistence by assessing that she could "maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout an eight-

hour workday," and limiting her to simple, routine, and repetitive tasks. Doc. 21 at 10, 12. The Commissioner also contends that the Tenth Circuit has routinely found that GAF scores do not directly correlate to an individual's ability to perform work and that the ALJ did not err in not explicitly discussing Dr. Adams' assessed GAF score. *Id.* at 10-11. The Commissioner further contends that the ALJ properly accorded less weight to Dr. Schutte's opinion related to Ms. Miller's ability to socially interact based on the record as a whole. *Id.* at 11-12. Lastly, the Commissioner asserts that the ALJ properly considered Dr. Munoz's opinion, but gave it little weight for a number of reasons. *Id.* at 13-14.

### 1. Treating Physician Julio Munoz, M.D.

Ms. Miller first presented to Julio Munoz, M.D., on March 16, 2015, to establish care. Tr. 770-75. She complained of dry mouth, high blood pressure, frequent urinary tract infections, and shortness of breath with activity. Tr. 770. She also reported weakness, numbness, tingling, and difficulty speaking related to cerebral vascular disease.[7] On physical exam, Dr. Munoz noted morbid obesity, limited ambulation, limited range of motion, irregular gait, diminished reflexes, finger-to-nose impaired, and heel-toe walking impaired. Tr. 773-74. Dr. Munoz assessed, *inter alia*, essential hypertension, hyperlipidemia, cerebrovascular accident, dysarthria, and abnormal gait. Tr. 774. Dr. Munoz referred Ms. Miller for physical and speech therapy, ordered lab work, requested records from previous primary care providers and neurologist,

---

[7] Ms. Miller had suffered an acute ischemic cerebrovascular accident (stroke) on August 29, 2011, and suffered a left frontal lobe and acute partial left middle cerebral artery infarct (stroke) on October 25, 2014. Tr. 520-34, 585-648.

discussed the benefits of weight loss, and instructed Ms. Miller to continue on all of her current medications, except for Nexium which he discontinued.[8]  *Id.*

Following the initial visit, Ms. Miller saw Dr. Munoz eighteen times over the next two years.  Tr. 746-75, 960-1019.  During that time, Dr. Munoz continued to diagnose and treat Ms. Miller for essential hypertension, hyperlipidemia, cerebrovascular accident, and dysarthria, and also diagnosed and treated and/or referred Ms. Miller for specialized treatment for anemia,[9] edema, multifocal PVCs,[10] chronic back pain,[11] sleep apnea,[12] abdominal pain,[13] foot pain,[14] urinary tract infections, and depression.  *Id.*

---

[8] Ms. Miller reported taking Azo (urinary tract pain), Bupropion (antidepressant), calcium, Chlorthalidone (antihypertensive), Clopidogrel (blood thinner), Crestor (cholesterol), Famotidine (antacid and antihistamine), Potassium Chloride, and Venlafaxine (nerve pain and antidepressant).  Tr. 771.

[9] In 2012, Ms. Miller was diagnosed with anemia associated with iron deficiency from gastroesophageal reflux disease and with a history of gastric ulcer.  Tr. 562-63, 851-52.  On May 14, 2015, Dr. Munoz sent Ms. Miller to the Carlsbad Medical Center Emergency Department for symptoms related to anemia, including generalized weakness, fatigue and shortness of breath with walking.  Tr. 760-65.  Ms. Miller was hospitalized from May 14, 2015, through May 16, 2015, and was diagnosed at discharge with, *inter alia,* anemia secondary to gastrointestinal bleeding.  Tr. 837.  Upon discharge, Dr. Munoz referred Ms. Miller to a gastroenterologist for specialized care.  Tr. 759.

[10] On December 8, 2015, Ms. Miller complained of lightheadedness and dizziness not associated with position changes.  Tr. 1012.  Dr. Munoz reviewed echocardiogram test results which demonstrated occasional multifocal PVS and referred Ms. Miller for a cardiology workup.  Tr. 1018-19.  Ms. Miller ultimately underwent an intraluminal coronary artery stent placement based on non-radiating chest pressure with associated shortness of breath (coronary atherosclerosis).  Tr. 1442-45, 1438-42.

[11] On July 29, 2016, Dr. Munoz referred Ms. Miller for x-rays based on her complaints of right leg pain and physical exam findings of musculoskeletal tenderness, limited range of motion, and irregular gait.  Tr. 989-96.  A lumbar spine series completed on August 2, 2016, demonstrated (1) degenerated disc changes at L4-L5; (2) grade 1 spondylolisthesis L5-S1; and (3) degenerative arthritis.  Tr. 1020.  On August 19, 2016, Dr. Munoz referred Ms. Miller for physical therapy, after which she reported much improvement.  Tr. 988, 1394-1414.

[12] On May 3, 2016, Dr. Munoz referred Ms. Miller for a sleep study based on her reports of, *inter alia*, loud snoring, gasping for air, witnessed apnea, restless sleep and morning headache.  Tr. 998-99.  Subsequent sleep study results demonstrated moderately severe obstructive sleep apnea/hypopnea syndrome.  Tr. 1021-22.  CPAP therapy was recommended.  *Id.*

[13] Dr. Munoz referred Ms. Miller to a gastroenterologist for her ongoing abdominal pain.  Tr. 759.  Mohmad Ajaz U. Bulbul, M.D., followed Ms. Miller for chronic gastritis.  Tr. 1372-1377.  Radiologic studies also demonstrated that Ms. Miller had a hiatal hernia.  Tr. 541-43, 545-46, 714-16, 778-79.

[14] On May 3, 2016, Dr. Munoz referred Ms. Miller to podiatry for ongoing complaints of right foot pain, with swelling, weakness and instability.  Tr. 950-52, 989.  On November 30, 2016, Ms. Miller underwent a right 1st

On June 16, 2017, Dr. Munoz prepared a Medical Source Statement: Mental and Physical Limitations on Ms. Miller's behalf.  Tr. 1571-75.  As for Ms. Miller's mental limitations to do unskilled work, Dr. Munoz assessed that she was *unlimited or very good* in her ability to (1) ask simple questions or request assistant; and (2) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  Tr. 1572.  He assessed she was *limited, but satisfactory*, in her ability to carry out very short and simple instructions.  *Id.*  Dr. Munoz assessed that Ms. Miller was *seriously limited, but not precluded* in her ability to (1) remember work-like procedures; (2) maintain regular attendance and be punctual within customary, usually strict tolerances; and (3) sustain an ordinary routine without special supervision.  *Id.*  He assessed that she was *unable to meet competitive standards* in her ability to (1) understand and remember very short and simple instructions; (2) maintain attention for two hour segments; (3) work in coordination with or proximity to others without being unduly districted; (4) make simple work-related decisions; (5) perform at a consistent pace without an unreasonable number and length of rest periods; and (6) respond appropriately to changes in a routine work setting.  *Id.*  Finally, Dr. Munoz assessed that Ms. Miller had *no useful ability* to function in (1) completing a normal workday and workweek without interruptions from psychologically based symptoms; (2) dealing with normal work stress; and (3) being aware of normal hazards and take appropriate precautions.  *Id.*  Dr. Munoz explained that "dyspnea on exertion" limited Ms. Miller's ability to exercise, that she was easily fatigued, and suffered arthralgias.  *Id.*  Dr. Munoz also noted that Ms. Miller has a low IQ or reduced intellectual functioning, and that her psychiatric conditions exacerbated her experience of pain and other physical symptoms.  Tr. 1573.

---

metatarsophalangeal arthrodesis, right 2nd hammertoe correction, right 2nd metatarsal shortening osteotomy, and debridement and subchondral drilling, right 2nd metatarsal head.  Tr. 945-46.

As for Ms. Miller's physical limitations, Dr. Munoz assessed, *inter alia*, that Ms. Miller (1) could not walk without pain; (2) could sit up to 45 minutes to 1 hour before needing to get up; (3) could stand for 10 minutes at one time before needing to sit down or walk around; (4) could sit/stand/walk for less than 2 hours; (5) would need periods of walking around in an 8-hour workday; (6) must walk every 15 minutes for about 15 minutes; (7) would need to take unscheduled breaks every 30-45 minutes and rest for one hour; (8) would need to have her legs elevated with sitting, 30-45 degrees, for three-quarters of the day; (9) could lift less than five pounds; and (10) would be out of work more than four days per month as a result of her impairments or treatment. Tr. 1574-75.

In further support of his assessment, Dr. Munoz explained that he sees Ms. Miller every eight to twelve weeks. Tr. 1571. He noted her diagnoses as cerebrovascular disease, status-post cerebral vascular accident; coronary artery disease, status-post stent placement; and obstructive sleep apnea. *Id.* He described Ms. Miller's symptoms as easily fatigued and inability to endure any physical activity, such as household chores. *Id.* He characterized the nature, location, and frequency of Ms. Miller's pain as neck pain, back pain and right hip pain several times a day and moderate. *Id.* He also noted that Ms. Miller had intermittent headaches. *Id.* As for his clinical and objective findings, Dr. Munoz noted decreased range of motion of the neck, trunk and right hip. *Id.* Dr. Munoz noted that Ms. Miller had an unsteady gait and severe dyspnea on exertion. *Id.*

The ALJ accorded Dr. Munoz's opinion little weight. Tr. 215. In doing so, he explained that "it is inconsistent with the consulting physician's findings showing the Claimant was able to ambulate and squat without difficulty. Further, the physician did not provide an explanation to justify the substantial limitations alleged." *Id.* For the reasons discussed below, the Court finds

the ALJ did not follow the correct legal standards in evaluating and weighing Dr. Munoz's opinion and that the ALJ's explanations for discounting his opinion are not supported by substantial evidence.

It is undisputed that Dr. Munoz is a treating physician. Therefore, the ALJ was required to evaluate his opinion pursuant to the two-part treating physician inquiry. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must determine whether the treating physician's opinion is entitled to controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Second, if the treating physician's opinion is inconsistent with the record or not supported by medical evidence, the opinion does not merit controlling weight but is still entitled to deference and must be weighed using the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal citations and quotations omitted); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). Not every factor is applicable in every case, nor should all six factors be seen as absolutely necessary. What is necessary, however, is that the ALJ give good reasons—reasons that are "sufficiently specific to [be] clear to any subsequent reviewers"—for the weight that he ultimately assigns to the opinions. *Langley*, 373 F.3d at 1119; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Branum v. Barnhart*, 385 F.3d 1268, 1275 (10th Cir. 2004). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating

physician's opinion outright only on the basis of contradictory medical evidence[.]" *Langley*, 373 F.3d at 1121.

Here, the ALJ discussed Dr. Munoz's opinion at step four of the sequential evaluation process. Tr. 214-250. In doing so, the ALJ did not evaluate Dr. Munoz's opinion pursuant to the two-part treating physician inquiry as he was required to do. At step one, the ALJ did not expressly state whether he had given Dr. Munoz's opinion controlling weight. That said, because it is clear from the ALJ's decision that he declined to give Dr. Munoz's controlling weight, this is not reversible error. *See Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) (finding no reversible error when the ALJ did not expressly state whether he had given a treatment physician controlling weight because the Court could tell from the decision that the ALJ declined to give controlling weight). At step two, however, there is no evidence that the ALJ accorded Dr. Munoz's opinion any deference or applied the relevant regulatory factors in weighing his opinion. To the contrary, the ALJ clearly rejected Dr. Munoz's opinion because the ALJ did not incorporate any of the functional limitations he assessed and he did so in the absence of contradictory medical evidence. This is error. *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (holding that an ALJ may choose to reject a treating physician's opinion only on the basis of contradictory medical evidence).[15] Moreover, the ALJ does not address the fact that

_____

[15] The other medical source opinion evidence that related to Ms. Miller's physical impairments included examining State agency medical consultant Juan Rossini, M.D.,'s opinion (Tr. 697-703), and nonexamining State agency medical consultants J. Quinlan, M.D.'s and Malcolm S. Druskin, M.D.'s opinions (Tr. 261-62, 276-77). On June 13, 2015, Dr. Rossini assessed that Ms. Miller could ambulate without difficulty and without an assistive device, and had limitations in mentation. Tr. 700. On June 27, 2015, and November 10, 2015, respectively, Dr. Quinlan and Dr. Druskin assessed that Ms. Miller's alleged physical impairments were nonsevere. Tr. 262, 277. The ALJ did not weigh Dr. Rossini's opinion. Tr. 214. This is error. The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions. *See* 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2)(ii),; *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."); *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) ("an ALJ's failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity"). The ALJ also did not weigh Dr. Quinlan's opinion. Tr. 216. This is error. Finally, the ALJ accorded little weight to Dr. Druskin's opinion

Dr. Munoz provided primary care to Ms. Miller for over two years, saw her every eight to twelve weeks, managed her many diagnoses with either treatment or referred care to specialized providers, and prepared treatment notes that indicated objective findings and diagnoses. 20 C.F.R. §§ 404.1527(c)(1)-(3) (explaining that more weight is given to a source's medical opinion if they have examined a claimant, treated a claimant, have more knowledge about a claimant's impairments due to the extent of their treatment relationship, and have presented relevant evidence to support their medical opinion, particularly medical signs and laboratory findings).

Further, the ALJ's explanations for rejecting Dr. Munoz's opinion are not supported by substantial evidence. By way of explanation, the ALJ stated Dr. Munoz's opinion was "inconsistent with the consulting physician's findings showing the Claimant was able to ambulate and squat without difficulty. Further, the physician did not provide an explanation to justify the substantial limitations alleged." Tr. 215. As to the former explanation, the ALJ relied on a June 13, 2015, exam note prepared by examining State agency medical consultant Juan Rossini, M.D., in which Dr. Rossini indicated on physical exam that Ms. Miller could "squat to the floor and recover" and ambulated without difficulty.[16] Tr. 700. In doing so, however, the ALJ failed to discuss why he rejected at least eight treatment notes in which Dr. Munoz indicated on physical exam that Ms. Miller had limited ambulation and irregular gait. Tr. 754-55, 759, 763-64, 769, 773-74, 988, 995, 999. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (holding that an ALJ is not required to discuss every piece of evidence, but in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted

_____

because he determined that the medical evidence supported functional limitations resulting from Ms. Miller's cerebrovascular accident which was inconsistent with Dr. Druskin's opinion that the late effects of Ms. Miller's cerebrovascular disease were not severe. *Id.*

[16] The ALJ did not weigh Dr. Rossini's opinion. *See* fn. 15, *supra*.

evidence he chooses not to rely upon, as well as significantly probative evidence he rejects); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (explaining that the opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all).  As to the latter explanation, the ALJ is simply wrong that Dr. Munoz did not provide an explanation to justify his assessed limitations.  To the contrary, Dr. Munoz answered a full page of questions concerning Ms. Miller's impairments in preparing his medical source statement, and his treatment notes provided relevant evidence that the ALJ failed to even discuss.[17]  Tr. 746-75, 960-1019, 1571.  Thus, the ALJ's explanations for rejecting Dr. Munoz's opinion are insufficient.

 For all of the foregoing reasons, the Court finds the ALJ did not follow the correct legal standards in evaluating and weighing Dr. Munoz's opinion and that his explanations for discounting his opinion are not supported by substantial evidence.  *Langley*, 373 F.3d at 1121.  This is reversible error.  Moreover, had the ALJ properly evaluated and weighed Dr. Munoz's opinion as required, he may have assessed physical limitations that would preclude Ms. Miller from returning to her past relevant work which is classified as heavy.[18]

---

[17] The Commissioner argues that Dr. Munoz's opinion was inconsistent with his own treatment notes.  Doc. 21 at 13-14.  The ALJ did not provide this explanation in his determination.  The Tenth Circuit has affirmatively held that the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision."  *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (ALJ's decision should be evaluated solely on reasons stated).

[18] *See* fn. 5, *supra.*

## 2.     Examining State Agency Psychological Source Opinions

### a.     Carl B. Adams, Ph.D.

On May 29, 2015, Ms. Miller presented to Dr. Adams for a mental status evaluation

Tr. 692-94.  Having taken Mr. Miller's various histories[19] and performing a mental status exam,

Dr. Adams made Axis I diagnoses of mood disorder due to medical condition; bereavement,

long-term; dementia due to CVA-mild; pain disorder, NOS; and anxiety disorder, NOS.  Tr. 695.

Dr. Adams assessed a GAF score of 50.[20]  Dr. Adams assessed that Ms. Miller had

> moderate limitations with detailed instructions, mild limitations with short and simple
> ones, and *moderate to severe limitations with concentration and task persistence*.  She
> has no limitations interacting with co-workers and supervisors.  Mild limitations being
> aware of normal hazards, and moderate limitations adapting to changes.

Tr. 694.  (Emphasis added.)

The ALJ accorded Dr. Adams' opinion great weight.  Tr. 215.

### b.     James W. Schutte, Ph.D.

On January 22, 2016, Ms. Miller presented to Dr. Schutte for a second mental

status examination.  Tr. 817-21.  Dr. Schutte took Ms. Miller's background and history,

and conducted a mental status exam.  Tr. 817-19.  Dr. Schutte also administered the

Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV),[21] the Wechsler Memory

---

[19] Dr. Adams took Ms. Miller's personal, educational, vocational, marital, and medical histories.  Tr. 693-94.

[20] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

[21] Dr. Schutte indicated that Ms. Miller exhibited deficits in all subtest areas (verbal comprehension, perceptual reasoning, working memory, and processing speed) with the exception of visual-motor construction skills and visual reasoning.  Tr. 819.  Ms. Miller's Full Scale IQ was 65, which is "extremely low."  *Id.*

Scale-Fourth Edition (WMS-IV),[22] and an Adaptive Behavior Checklist. Tr. 819-20.

Dr. Schutte made Axis I diagnoses of probable major vascular neurocognitive disorder

and unspecified anxiety disorder. Tr. 820. Dr. Schutte assessed that Ms. Miller's

> ability to understand and remember basic instructions seems mildly impaired due
> to a neurocognitive disorder. *Her ability to concentrate and persist at tasks of*
> *basic work seems markedly impaired[23] due to a neurocognitive disorder.* Her
> ability to interact with the general public and/or her co-workers seems markedly
> impaired due to a neurocognitive disorder and depression. Her ability to adapt to
> changes in the workplace seems moderately impaired due to a neurocognitive
> disorder, depression and anxiety.

Tr. 821. (Emphasis added.)

The ALJ accorded little weight to Dr. Schutte's opinion regarding Ms. Miller's

ability to interact with others, but accorded great weight to all of Dr. Schutte's other

opinions regarding Ms. Miller's mental functional limitations. Tr. 216.

The question before the Court is whether the ALJ, having accorded *great weight* to the

examining State agency psychological consultant opinions regarding Ms. Miller's limitations in

the area of concentration, persistence and pace, failed to properly incorporate their limitations in

the RFC.[24, 25] The Commissioner argues, without more, that the ALJ adequately accounted for

---

[22] Ms. Miller's "memory skills were measured to be within the extremely low to low average range." Tr. 820. Dr. Schutte further noted "there appears to be a memory deficit." *Id.*

[23] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(C) ("a marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to functional independently, approximately, effectively, and on a sustained basis"); *see also* POMS DI 24510.063, B.3. (a claimant is markedly limited "when the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity"). The POMS is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

[24] Although the consultants do not use the same terms to describe Ms. Miller's limitation in this area, they agree that she is more than moderately impaired in this area; *i.e.,* "moderate to severe" and "markedly impaired."

[25] Ms. Miller argues that the ALJ improperly accorded little weight to certain portions of Dr. Schutte's opinion while according great weight to other portions of his opinion. Doc. 20 at 22-24. Having determined that this matter should be remanded on other grounds, the Court does not address this issue.

Ms. Miller's limitation in this area by assessing that she could "maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout an eight-hour workday," and limiting her to simple, routine, and repetitive tasks. Doc. 21 at 10, 12.

The Tenth Circuit has held that limiting a claimant to unskilled work, or simple, routine, and repetitive tasks, may in some cases account for *moderate* limitations in concentration, persistence, and pace. *Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1290 n. 3 (10th Cir. 2012) (recognizing that restrictions to unskilled jobs do not in all instances account for the effects of mental impairments); *see also Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) (holding that a *moderate* limitation in concentration, persistence, and pace can be incorporated into an RFC which states that the claimant could engage in only simple, repetitive, and routine tasks). And certain nonbinding decisions have held that limiting a claimant to unskilled work, or simple, routine, and repetitive tasks, may in some cases account for *marked* limitations in concentration, persistence, and pace. *See Trujillo v. Berryhill*, USDC NM Civ. No. 16-851 GBW, 2017 WL 2799981, at *8 (D.N.M. June 23, 2017 (finding that the plaintiff's *marked* limitations in concentration and pace were properly incorporated into her RFC which included "significant limitations" that restricted plaintiff to "simple, routine, and repetitive work involving one and two step instructions" performed in "a routine, predictable, and low-stress work environment" with only "occasional contact with supervisors and coworkers" and "minimal to no contact with the public") (citing *Nelson v. Colvin*, 655 F. App'x 626, 629 (10th Cir. 2016) (unpublished));[26] *Thomas v. Barnhart*, 278 F.3d

---

[26] The Court explained that *Nelson* established "that there is nothing so unique about marked limitations which per se prevents them from being incorporated into more generic limitations on categories of work." *Trujillo*, 2017 WL 2799981, at *8. It further explained that while *Nelson* did not involve marked limitations in concentration, persistence, and pace, it did involve marked limitations to similar mental faculties. *Id.* The Court concluded,

947, 958 (9th Cir. 2002) (finding that, based on VE testimony, a claimant with a "marked limitation in her ability to maintain concentration over extended periods" would be capable of performing simple, unskilled tasks).

Here, however, the Court finds the ALJ's RFC does not adequately incorporate Dr. Adams' and Dr. Schutte's assessed limitations regarding Ms. Miller's ability to concentrate and persist at tasks. As an initial matter, the cases cited above, wherein a restriction to unskilled, or simple, routine and repetitive work was deemed sufficient to account for *marked* limitations in concentration and task persistence, are distinguishable. In *Trujillo*, only one medical source opinion was at issue to which the ALJ had accorded only substantial weight, and the Court found that the ALJ had included significant limitations in three functional areas that specifically addressed the marked limitation in concentration and pace. *Trujillo*, 2017 WL 2799981, at *9. That is not the case here. In *Thomas*, the ALJ addressed a marked limitation to maintain concentration *over extended periods* and also relied on VE testimony to determine the claimant would be capable of performing simple, unskilled tasks even with a "low ability to concentrate for *sustained periods* of time." *Thomas*, 278 F.3d at 958. Again, that is not the case here.

Here, the ALJ accorded Dr. Adams' and Dr. Schutte's opinions great weight, yet failed to explain why he deviated from their assessed limitation in the area of concentration and task persistence, or to explain how the restriction he assessed was sufficient in light of the medical source opinion evidence and the record as a whole.[27] *See generally Jaramillo v. Colvin*, 576 F.

---

therefore, that *Nelson* strongly supported the argument that such marked limitations can be incorporated into an RFC by limiting the claimant to certain types of simple work. *Id.*

[27] The Court notes that at step two, the ALJ determined that Ms. Miller's degree of impairment in concentrating, persisting, and maintaining pace was *marked*. Tr. 211. On June 13, 2016, examining State agency medical consultant Juan Rossini, M.D., assessed that Ms. Miller had limitations in "mentation"; *i.e.,* mental activity. Tr. 700. (The ALJ did not weigh Dr. Rossini's opinion as he was required to do. *See* fn. 14, *supra*.) On June 29, 2015, nonexamining State agency psychological consultant H. T. Unger, M.D, assessed that Ms. Miller had moderate

App'x 870, 876 (10th Cir. 2014 ) (unpublished) (finding error in the ALJ's failure to incorporate a psychiatrist's "moderate" limitation when the ALJ had accorded the opinion "great weight"). Further, Dr. Schutte's opinion relied in large part on objective testing that clearly demonstrated Ms. Miller had significant deficits in verbal comprehension, working memory, processing speed, auditory memory, immediate memory and delayed memory.[28]  Tr. 819-20.  And Dr. Schutte's diagnoses included probable major vascular neurocognitive disorder, noting that Ms. Miller had a reported history of two strokes.[29]  Tr. 820.  Additionally, Dr. Munoz, whose opinion the ALJ failed to properly evaluate, assessed that Ms. Miller was "unable to meet competitive standards"[30] in her ability to, *inter alia*, "maintain attention for two-hour segment[s]" and "perform at a consistent pace without an unreasonable number and length of rest periods."  Tr. 1572.  Thus, Dr. Munoz's treating source opinion supports Dr. Adams' and Dr. Schutte's opinions regarding Ms. Miller's limitations in her ability to concentrate and persist at tasks.[31]

     For the foregoing reasons, the Court finds that having accorded great weight to Dr. Adams' and Dr. Schutte's opinions, the ALJ's RFC does not adequately reflect Ms. Miller's

---

limitations in maintaining concentration, persistence and pace, but could perform simple, routine and repetitive tasks for 2 hours periods.  Tr. 266.  The ALJ accorded Dr. Unger's opinion great weight.  Tr. 216.

[28] *See* fns. 20, 21, *supra.*

[29] Major Vascular Neurocognitive Disorder is diagnosed when a person has one or more problems that result in impairment in daily functioning.  When vascular neurocognitive disorder is diagnosed there should be either evidence that: (1) cognitive deficits are related to a vascular condition such as a stroke; or (2) evidence for changes in complex aspects of attention or reasoning.  https://www.gulfbend.org/poc/view_doc.php?type=doc&id= 3237&cn=5.

[30] "Unable to meet competitive standards means your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  Tr. 1572.

[31] Ms. Miller argues that Dr. Adams' assessed GAF score of 50 further demonstrates she is more restricted in her ability to concentrate and persist at tasks than the ALJ assessed.  Doc. 20 at 19-20.  Having already found that the ALJ's RFC failed to adequately incorporate Ms. Miller's assessed limitations in her ability to concentrate and persist at tasks, the Court need not address whether the ALJ erred in failing to specifically evaluate the GAF score in his determination.

limitations in the area of concentration and task persistence.  This is error.  *Doyal v. Barnhart*,

331 F.3d 758, 764 (10th Cir. 2003) (an ALJ is required to provide specific, legitimate reasons for

rejecting medical source opinion evidence).

**B.**　　**Remaining Issues**

The Court will not address Ms. Miller's remaining claims of error because they may be

affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299

(10th Cir. 2003).

**IV.  Conclusion**

For the reasons stated above, the Court finds Ms. Miller's Motion to Reverse or Remand

(Doc. 20) is well taken and is **GRANTED.**

_____

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**